# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### LAFAYETTE DIVISION

|  |  |
|---|---|
| JANE DOE, as mother and natural guardian of JANE DOE 2, <br><br>     Plaintiff, <br><br>   vs. <br><br> TIPPECANOE SCHOOL CORPORATION, JOHN BEEKER and FRED ROOP <br><br>     Defendants. | NO. 4:15-CV-00056 |

## OPINION AND ORDER

This matter is before the Court on: Defendants' Motion to Summary Judgment, filed on October 27, 2016 (DE #44); Plaintiff's Motion for Partial Summary Judgment against Defendant Tippecanoe School Corporation, filed on March 6, 2017 (DE #68); Defendants' Motion to Strike Certain Evidence Designated by Plaintiffs [*sic*] Regarding Summary Judgment, filed on May 4, 2017 (DE #78); Defendants' Motion to Limit or Exclude the Testimony of Plaintiffs' [*sic*] Expert Witnesses, filed on May 4, 2017 (DE #80); and Plaintiff's Motion for Leave to Supplement Qualifications of Dr. Kristine Chapleau, filed on June 19, 2017 (DE #92). For the reasons set forth below, Defendants' motion for summary judgment

(DE #44) is **GRANTED.** Plaintiff's motion for partial summary judgment (DE #68) is **DENIED AS MOOT**. Defendants' motion to strike evidence (DE #78) is **DENIED**. Defendants' motion to limit or exclude Plaintiff's expert witnesses (DE #80) is **DENIED AS MOOT**. Plaintiff's motion for leave to supplement (DE #92) is **DENIED AS MOOT**. Plaintiff's claims for violations of 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), are **DISMISSED**. The Clerk is directed to **REMAND** this case to Tippecanoe Circuit Court for further proceedings.

BACKGROUND

Jane Doe 2 ("Doe") was a fourteen year old student at Defendant Tippecanoe School District Corporation's ("TSC") McCutcheon High School when she first met teacher Jakob Robinson ("Robinson") during the second semester of her freshman year. Over time, Robinson became Doe's mentor, and Doe worked as Robinson's teacher's assistant. Doe's mother Jane Doe ("Plaintiff"), school counselors and others raised concerns about Robinson's close relationship with Doe with school administrators. Beginning in late 2014, during Doe's junior year of high school, Robinson and Doe engaged in a sexual relationship for approximately three months. During that time, Robinson and Doe kept their sexual relationship a secret from Plaintiff, teachers and school

administrators.  Doe eventually confessed the sexual relationship.
Robinson pled guilty to child seduction and is in prison.

In July 2015, Plaintiff, as natural guardian of Doe, filed a
lawsuit in Tippecanoe Circuit Court against TSC and high school
administrators John Beeker and Fred Roop (together, "Defendants").
Defendants removed the case to the United States District Court
for the Northern District of Indiana, Lafayette Division.
Plaintiff's Amended Complaint ("Complaint") alleges a state law
claim of negligence, and violations of 42 U.S.C. § 1983 and Title
IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C.
§1681(a).  Defendants filed a motion for summary judgment on all
of Plaintiff's claims (DE #44).  Plaintiff filed a motion for
partial summary judgment on the issue of contributory negligence
(DE #68).  Defendants filed a motion to strike portions of
Plaintiff's evidence (DE #78), and a motion to limit or exclude
Plaintiff's expert witnesses (DE #80).  Plaintiff filed a motion
for leave to supplement an expert's qualifications (DE #92).  All
five motions have been fully briefed and are ripe for adjudication.


DISCUSSION

Motion to Strike Plaintiff's Evidence

Defendants move to strike certain portions of Plaintiff's
Statement of Material Facts as being impermissible legal
conclusions, irrelevant, and based on speculation.  "Motions to

strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party." *The Cincinnati Ins. Co. v. Lennox Industs., Inc.*, No. 3:14-CV-1731, 2016 WL 495600, at *4 (N.D. Ind. Feb. 9, 2016) (citing *Kuntzman v. Wal-Mart*, 673 F. Supp. 2d 690, 695 (N.D. Ind. 2009), and *Gaskin v. Sharp Elec. Corp.*, No. 2:05-CV-303, 2007 WL 2228594, at *1 (N.D. Ind. July 30, 2007)). Furthermore, "[i]t is the function of the Court, with or without a motion to strike, to carefully review the evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement." *Davis v. Munster Med. Research Found., Inc*., 213 F. Supp. 3d 1074, 1083 (N.D. Ind. 2016) (citations omitted). The Court has sifted through the voluminous evidence and has considered it under the applicable federal rules, giving each piece the credit to which it is due. Accordingly, the Court denies the motion to strike (DE #78) as unnecessary.

Undisputed Facts

TSC operates McCutcheon High School ("McCutcheon"). Defendant John Beeker ("Beeker") has been the principal at McCutcheon since 2002. Beeker considers himself to be in a "[f]raternity" with the teachers at McCutcheon. (DE #70-2 at 3-4.) During the time period at issue, McCutcheon had four assistant

principals, including Jake Burton ("Burton"), Michael Lowrey ("Lowrey"), and Defendant Fred Roop ("Roop"). These administrators are in charge of evaluating teachers. TSC has a sexual harassment policy, and expects its administrators to look into improper teacher-student relationships.

Doe began attending McCutcheon as a freshman in 2012-13. At that time, Robinson was a physical education ("PE") teacher and assistant football coach at McCutcheon. Doe met Robinson during the second semester of her freshman year, when he taught her PE class. Doe testified that she and Robinson "would talk a lot and . . . joke around" while in Robinson's class. (DE #45-7 at 2.) Doe confided to Robinson about family problems at home, after which he gave her a hug and told her that "he was always going to be there" for her. (*Id.*) According to Doe, she knew at that point that "he cared for me." (*Id.*) At that time, Doe thought of Robinson only as a "mentor" and "father figure." (*Id.* at 3.) He encouraged Doe in sports and wanted her to do her best in school. During her freshman year, Doe once went to Robinson's house to watch a football game on television, and Plaintiff knew that she Doe was going to do so. At that time, Plaintiff knew that Doe considered Robinson to be a "mentor/father figure," and "probably had a crush" on Robinson. (DE #45-6 at 2, 9.) Plaintiff saw Doe and Robinson interact, but never noticed Robinson ever act in a

way that seemed affectionate in any way, or put her on guard, during Doe's freshman or sophomore years. (DE #45-6 at 9.)

During the first semester of Doe's sophomore year, Doe worked as a teacher's assistant ("TA") for Robinson. Robinson and she began hugging almost daily, but always when the two were alone, because they "didn't want anybody to see it." (DE #45-7 at 5.) Doe began eating lunch in the office of McCutcheon's head football coach, Ken Frauhiger ("Frauhiger"), where Frauhiger or Robinson would help her with homework. (*Id*.) Beeker was aware that Robinson and Doe had eaten lunch together, but did not know they did so with regularity. During passing periods, Doe would visit Robinson in the hallway where he stood with Frauhiger and Scott Muncy ("Muncy"), who was an assistant football coach and PE teacher. According to Muncy, Doe interacted with Robinson, Frauhinger and Muncy. (DE #45-9 at 2.) Robinson and Doe would engage in "silly play," in that Robinson would occasionally mess Doe's hair, punch her in the arm, or give her a "wet willy." (DE #45-7 at 8; *see* DE #70-12 at 6). Robinson would also act this way with other students. (DE #70-12 at 6.) Frauhiger "never saw anything," though he noted that Doe came to talk with Robinson, Muncy and Frauhiger between every passing period. (*Id*. at 4.) Frauhiger spoke to Robinson about the time he spent with Doe because another teacher thought Doe was spending an excessive amount of time at PE. Frauhiger asked Robinson if he was "doing

everything right and . . . being the person you're supposed to be," to which Robinson responded, "Absolutely, she's my daughter and you know that." (DE #45-5 at 6.) When Doe's friends would ask Doe "what are you and Robinson," she would say, "he's like a dad to me." (DE #45-7 at 5.)

Burton saw Doe talking to all three PE teachers, but "didn't see anything that [he] thought was out of ordinary." (DE #45-3 at 3.) Burton noted that "kids would go to different staff member's offices and eat lunch with them all the time so that wasn't anything unusual in my mind." (*Id.* at 7.) Burton testified that during Doe's sophomore year, he heard that Robinson and Doe "were seeing each other more than a student/teacher relationship," that "they are together all the time," and that their relationship was "[t]oo close," "unusual" or "odd." (*Id.* at 2-3.) Burton believes that he discussed the matter with Beeker two or three times during Doe's sophomore year. (*Id.* at 3.) Beeker told Burton that he had talked to Doe's mother, and that she said there was nothing to it. (*Id.*)

Robinson and Doe spoke over the phone and texted each other during her sophomore year. During one phone call, Robinson told Doe that he loved her, but she understood this to be fatherly love, and she told him that she loved him like a father. (DE #45-7 at 7-8.) Doe described his texts as "flirtatious" (such as using a winky face) but not sexual. (*Id.* at 13.) At the end of her

-7-

sophomore year and into her junior year, Robinson began to tell Doe about problems in his marriage. (*Id.* at 15.)

Plaintiff testified that during Doe's sophomore year, she told Beeker that Doe "talks about [Robinson] a lot, more than an average student, I think, should talk about a teacher. But on one hand, I knew that – she liked him. You could tell that she liked him" and that he was her mentor. (DE #45-6 at 7.) She also told Beeker that Doe and Robinson were talking about Robinson's divorce. (*Id.* at 8.) At this point, Plaintiff did not have a concern that "there was anything going on." (*Id.*) Beeker testified that Plaintiff called him to ask about Doe's role as a TA. (DE #70-2 at 2.) In response to Plaintiff's call, Beeker asked Frauhiger if he had seen Doe being late for class or "hanging around down there." (*Id.*) Beeker wanted to make sure Doe was not abusing her TA position. (*Id.*)

During the second semester of Doe's sophomore year, Doe met with school counselor Stephanie Rodgers ("Rodgers"). (DE #70-16 at 2.) Doe told Rodgers that she and her mother had been arguing a great deal regarding her contact with Robinson, and that she and Robinson texted each other outside of school. (*Id.*) Rodgers asked Doe if her conversations with Robinson ever became inappropriate, "[d]id you have a sexual conversation, or were you intimate with him in any way," and Doe responded no. (*Id.*) Thereafter, Rodgers spoke to another school counselor and Burton about her conversation

with Doe. Burton asked her if she thought if there was any sexual contact between Robinson and Doe, and she responded that she did not believe that was happening. (*Id*. at 3.) Burton told Rodgers that he would speak with Robinson, and that Rodgers "could basically step back." (*Id*.)

In the fall of 2014 (Doe's junior year), Jennifer Smith ("Smith") became Doe's school counselor. Smith testified that another school counselor told her that there was "talk of [Doe's] relationship with Jake [Robinson]" but she did not provide Smith with any specifics. (DE #45-11 at 4.) Doe told Smith that her mother was concerned about her relationship with Robinson, and explained that that Robinson was like a father figure to her. (*Id*.) Smith did not ask Doe for any specifics about her relationship with Robinson. (DE #70-18 at 5.) Smith told Burton that she had some sense of "crossing the line" in the relationship between Robinson and Doe, but did not discuss the details with him. (DE #45-3 at 6.) Burton told her that it was "I don't know how many times, let's say twentieth time I've heard this stuff. Take it to Beeker because he's involved in it and he knows. He's talked to the mom. The mom says it's ok." (*Id*.) Smith passed this information along to Beeker. Beeker asked Smith if she thought "anything is going on, and at that point [she] said no." (DE #45-11 at 4.)

Plaintiff contacted Beeker twice during Doe's junior year regarding Doe's relationship with Robinson. She told Beeker that Robinson had discussed his marital problems with Doe, and had asked her to go to King's Island with Robinson "to help with one of his daughters;" Plaintiff had denied this request. (DE #45-6 at 11.) Beeker responded that he did not know why Robinson had asked Doe to go to King's Island, but noted that Robinson was Doe's mentor. (*Id*. at 12.) In a separate conversation, Plaintiff told Beeker that Robinson and Doe were having lunch together in the football office, and she wanted it to stop. (*Id*.) Beeker told her that "he would keep an eye on it." (*Id*. at 13.) At some point months before January 2015, Beeker told Frauhiger that Plaintiff was concerned about Robinson and Doe "spending an inordinate amount of time together." (DE #45-5 at 2.) Frauhiger testified that Beeker "asked me if there was anything inappropriate going on and I said absolutely not." (*Id*. at 3.) Frauhiger told Robinson, "[d]on't do anything to get yourself in trouble," because Beeker had called him. (DE #70-12 at 6.)

At the beginning of Doe's junior year, Robinson was one of Doe's teachers and she was his TA. (DE #45-7 at 15.) She would see him after every class period. (*Id*.) According to Doe, their hugs became more like "a boyfriend/girlfriend hug," but were hidden, "[u]sually in the weight room." (*Id*.) In early October 2014, Robinson was absent from school for a week. After learning

that Robinson was getting a divorce, Doe texted him.  Robinson
told her that he loved her and she was the only person he wanted
to talk to.  (*Id*. at 17.)  On October 5, 2014, Doe had a friend
drive her to Robinson's house.  When she arrived, Robinson hugged
her and cried about the breakdown of his marriage.  Doe had not
told Plaintiff where she was going, and left because Plaintiff
kept calling her.  She later returned to Robinson's house after he
texted that he "needed" her, where they kissed.  (*Id*. at 20).
Robinson and Doe first had sexual intercourse in mid-October at
Robinson's residence.  (*Id*. at 21.)  Doe was sixteen years old at
that time.  They had sexual encounters at school while behind
closed doors, including in the training room, the locker room,
weight room, the head coach's office, the girls basketball coach's
office, and the outside football office.  (*Id*. at 21, 23, 24.)
All instances of sexual intercourse occurred off of school grounds,
mostly at Robinson's parents' home.  (*Id*. at 22-24.)

In December 2014, the mother of one of Doe's friends, Brandy
Burger ("Burger"), spoke to Roop about the relationship between
Robinson and Doe.  Burger told Roop that Robinson and Doe "had
gone to lunch together, that he showed favoritism to her in class,
and . . . she was allowed to use her phone."  (DE #45-2 at 4.)
She testified that she told Roop her concerns that Robinson and
Doe "were inappropriate and that I needed that to be checked to
make sure nothing more was going on." (*Id*. at 2.) Burger suspected

that the relationship was sexual, but "never said anything about [her] suspicion" to Roop. (*Id*.) Roop told Burger that he would let Beeker know, and later called to tell her that Beeker was aware of the situation and that it had been looked into. (*Id*. at 3.)

Roop testified that the week before finals, a parent called to say that she had heard that Robinson and Doe had dinner somewhere together, and wanted to know if the school was aware of this. (DE #45-10 at 4.) He could not recall who the parent was with certainty.[1] Roop told the parent that he would find out what the school knew. According to Roop, Beeker told Roop that he had spoken to Plaintiff and that Robinson was "more of a family friend." (*Id*. at 5.) Roop returned the parent's call to tell her what Beeker had told him.

On December 18, 2014, Robinson and Doe decided to leave McCutcheon during the school day to have sexual intercourse at Robinson's parents' home. (De #45-7 at 25.) That morning, Doe suggested that Robinson purchase drinks at McDonald's, so that they could claim that they had gone to lunch there. (*Id*.) Roop saw Robinson and Doe leaving the school building, and radioed Beeker to let him know. (DE #45-1 at 9.) Roop and Lowrey followed

---

[1] Defendants contend that Roop's telephone conversation with the parent was his call with Burger, rather than a separate call with the parent identified by Roop, because the identified parent categorically denies having a conversation with Roop about having seen Robinson and Doe eating dinner together in December 2014. (DE #45-13 (Affidavit of Debra Weideman); *see* DE #45-1 at 7 (Beeker's testimony that "it was Mrs. Burger not Weideman").) This is an issue of fact that the Court must consider in the light most favorable to Plaintiff, and thus, will not infer that Roop only spoke with Burger.

them because they wondered where they were going. (DE #45-10 at 6.) Beeker had not directed Roop to follow them, and did not think of contacting Robinson by cell phone. (DE #45-7 at 10, 11.) While Robinson and Doe were still away from school, Beeker called Plaintiff to let her know that Robinson had taken Doe off of school property, and asked if she knew why they left. (DE #70-2 at 5; DE #45-6 at 13.) Plaintiff told Beeker that she did not know, and suggested that they were leaving to go have sex. (DE #70-2 at 5.) Beeker told her that there "was no evidence or premise that that's happening." (*Id*.) Beeker told Plaintiff that they had somebody following them, and asked her not to call or text Doe because he wanted to see where they went, and that he would call her when they returned to school. (DE #45-6 at 13-14.) Beeker had an opportunity to tell Roop and Lowrey to stop Robinson and Doe and tell them to return to school, but chose not to do so. (DE #70-2 at 5.)

Roop and Lowrey followed Robinson and Doe, and watched them pull into a driveway and go into a house. (#45-10 at 7.) Roop and Lowrey then returned to McCutcheon and told Beeker what they observed. (*Id*. at 8.) Roop and Lowrey determined that the house was owned by someone named "Robinson." (*Id*. at 9.) Roop and Lowrey accessed Doe's school email account, and while they did not see any inappropriate messages, they noticed that Robinson and Doe had emailed each other late at night. (*Id*.) One of Doe's emails

to Robinson stated, "My Kind of Love, by Emeli Sande, it's exactly how I feel lately, I just haven't had any way to talk to you about things." (DE #70-17 at 9.) Roop did not recall seeing this email; Lowrey was also unfamiliar with this email. (DE #70-17 at 8; DE #70-13 at 4.) They were not familiar with, and did not look up, the lyrics to the song referenced in the email. (DE #70-17 at 8-9; DE #70-13 at 4.)

Robinson and Doe had violated school rules by leaving the school without the requisite permission. (DE #70-13 at 8.) Upon their return to school, Beeker called Doe to his office. She carried a McDonald's cup into Beeker's office for the purpose of lying to Beeker about her whereabouts. (DE #45-7 at 25.) Beeker did not ask Doe if she was having a sexual relationship with Robinson, but Doe asked Beeker if he was thinking that was going on. (DE #70-2 at 7.) Doe told Beeker that she and Robinson went to the house to get money and change laundry over, and then went to McDonald's. (DE #45-7 at 25.) Beeker believed her lies, and Doe believed that Beeker believed her. (*Id.*) Beeker testified that Robinson and Doe's going to the house did not cause him to suspect inappropriate conduct. (DE #45-1 at 11.) Beeker told Roop that the two had gone to lunch. (DE #45-10 at 10.)

Beeker called Plaintiff and told her that he had talked to Doe, that she had a McDonald's cup, that she said they had gone to the house to pick something up, and then went to McDonald's. (DE

#45-6 at 14.) According to Plaintiff, the time period between Beeker and Plaintiff's first and second calls was 20-30 minutes. (*Id.*) Plaintiff testified that Beeker said that the school "overreacted." (DE #45-6 at 14.) Doe told Plaintiff the same lies she told Beeker, and Plaintiff believed her. (*Id.*) Plaintiff thought Beeker was justified in trusting Doe at that time, and did not feel at all that Robinson and Doe were having a sexual relationship. (*Id.*)

Beeker also met with Robinson. According to Beeker, Robinson told him a very similar story as Doe, but longer. (DE #70-2 at 7.) According to Robinson, Beeker met with Robinson the next day and told him that Doe's mother had called and that Beeker had told her there was nothing to worry about. (DE #70-15 at 6.) Beeker noted that Doe "had the cup; verified where [they] were." (*Id.* at 4.) Beeker also told Robinson that he thought that Plaintiff was jealous of Robinson's relationship with Doe. (*Id.*) Beeker did not ask Robinson if he was sexually involved with Doe. (*Id.* at 6.) Robinson testified that this was Beeker's only conversation with him about his relationship with Doe. (*Id.*) Burton, Roop and Lowrey never questioned Robinson about his relationship with Doe. (*Id.* at 5-6.)

Robinson and Doe did their best to hide their relationship from everybody. (DE #45-7 at 21.) When Doe was with Robinson, Doe would text Plaintiff pictures of the mall to show that she was

there, but the photos had been taken on earlier trips to the mall. (*Id.* at 4.) She and Robinson developed a code where she would start texts to him with "105" so that Robinson would know it was Doe texting (and not Plaintiff). (*Id.* at 34.) Doe testified that no one ever saw them doing anything sexual on school grounds. (*Id.* at 24.) She testified that they became more publicly "touchy" with each other during her junior year, but says this consisted of each resting his or her hand on the other's shoulder. (*Id.*) Doe believed that they were successful in keeping their sexual activities a secret from everyone. (*Id.* at 21.) Doe testified that Robinson "was freaking out" about them getting caught, but Doe would tell him to "calm down," "relax," "it'll be fine." (*Id.* at 32.)

During winter break, Plaintiff allowed Doe to go with Robinson to restaurants in order to observe the two of them together, but she did not see anything that concerned her. (DE #45-6 at 6.) She had no problem with Robinson and Doe spending time together when working on classwork. (*Id.*) Plaintiff maintains that the school had assured her "it was more or less just a mentor relationship. Nothing I should be concerned about." (*Id.*) She never checked Doe's phone to see how often she was communicating with Robinson because she never thought there was a sexual relationship. (*Id.* at 15.) Plaintiff is aware of no adult who

had any information about the fact that Robinson and Doe were having a sexual relationship. (*Id*. at 10.)

Robinson was arrested at McCutcheon on January 9, 2015, the first day of school after winter break. Doe initially lied to the police about her relationship with Robinson, but admitted it after learning the police had evidence of the communications between the two of them. (DE #45-7 at 27.) Robinson pled guilty to child seduction and is in prison. (DE #4 at 9.) Doe attended McCutcheon through the end of the 2014-15 school year, and enrolled in a different school for her senior year.


## Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all claims against them. Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine dispute of material

fact exists, the Court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

A party opposing a properly supported summary judgment motion may not rely on allegations in his own pleading but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (citation omitted). If the nonmoving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *See Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

A.    42 U.S.C. § 1983 Claims

Defendants argue that they are entitled to summary judgment on Plaintiff's 42 U.S.C. § 1983 claims against all Defendants, including any retaliation claims. Plaintiff does not respond to these arguments, and therefore waives any argument that these claims are valid. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church,* 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in opposition to a motion for summary judgment are waived); *Palmer v. Marion County*, 327

F.3d 588, 597-98 (7th Cir. 2003) (holding that a party abandoned his claim where he failed to delineate the claim in opposition to a motion for summary judgment); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented in response to a summary judgment motion are waived). Therefore, the Section 1983 claims are dismissed.

    B.    Title IX Claim

"Title IX prohibits discrimination on the basis of sex in educational programs or activities that are supported by federal financial assistance." *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 604 (7th Cir. 2008) (citing 20 U.S.C. § 1681(a)). "[A] teacher's sexual harassment of a student may render a school district liable for sex discrimination under Title IX." *Id*. at 605 (citation omitted). A school district's liability cannot, however, be premised on the ground of *respondeat superior*. *Doe v. St. Francis Sch. Dist.,* 694 F.3d 869, 871 (7th Cir. 2012) (citation omitted). To survive summary judgment, Plaintiff must establish a genuine issue of fact as to whether an appropriate official at TSC "had (1) actual knowledge of misconduct by [Robinson] that created a serious risk to its students, and (2) responded with deliberate indifference to the misconduct." *Hansen*, 551 F.3d at 606; *see Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290, 118 S. Ct. 1989, 141 L.Ed. 2d 277 (1998).

1.  Actual Knowledge

"[A] school district is subject to a private damages action only where it is deliberately indifferent to *known* acts of discrimination or harassment." *Hansen*, 551 F.3d at 605 (emphasis in original; citations omitted). "[U]nder *Gebser*, a plaintiff in a Title IX damages suit based on a teacher's behavior must prove both actual knowledge of misconduct, not just actual knowledge of the risk of misconduct, and . . . that the officials having that knowledge decided not to act on it." *Id*. (citation omitted); *see St. Francis,* 694 F.3d at 871 (citing *Hansen*, 551 F.3d at 605); *Gebser*, 524 U.S. at 290 ("[A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.").[2]

---

[2] Plaintiff argues that the standard is notice of Robinson's "misconduct," not notice that Robinson was having sexual intercourse with Doe. She cites TSC's sexual harassment policy for the proposition that sexual harassment does not require sexual intercourse. (DE #69 at 9.) But Plaintiff's claim arises under Title IX, not school policy. "[I]n determining whether conduct is sexual harassment under Title IX, the question is whether the conduct altered the conditions of the student's education, regardless how a particular school defines sexual harassment." *Doe v. Madison Metro. Sch. Dist.*, 218 F. Supp. 3d 826, 834 (W.D. Wis. 2016) (W.D. Wis. Feb. 9, 2017) (rejecting argument that teacher's conduct was sexual harassment because it violated school policies). TSC does not dispute that sexual conduct rises to the level of severe and pervasive contact under Title IX, but disputes that anything short of that conduct was severe and pervasive. (DE #75 at 7.) The Court agrees. Plaintiff does not proffer evidence of misconduct by Robinson that occurred prior to his sexual encounters with Doe that rises to the level of sexual harassment under Title IX.

Plaintiff cites *Delgado v. Stegall,* 367 F.3d 668 (7th Cir. 2004), for the proposition that "it ought to be enough for liability under Title IX that when there are 'known' or 'obvious' risks that makes a failure to take steps against it reckless." (DE #69 at 10-11 (citing *Delgado,* 367 F.3d at 672).)  The Seventh Circuit has rejected a plaintiff's reliance on *Delgado* to argue that something less than actual knowledge of a teacher's misconduct will suffice as a predicate to Title IX liability.  *See Hansen*, 551 F.3d at 605.  *Hansen* reiterated the requirement of "actual knowledge of misconduct, not just actual knowledge of the risk of misconduct," and emphasized that *Delgado* "noted that a school district need not possess actual knowledge of a teacher's acts directed at a *particular plaintiff,* but it must still have actual knowledge of misconduct that it would create risks 'so great that they are almost certain to materialize if nothing is done.'"  *Id.* at 605-06 (quoting *Delgado,* 367 F.3d at 672) (emphasis in original).  Here, Plaintiff presents no evidence that Defendants had actual knowledge of Robinson's misconduct directed at other students.  *Cf. id.* at 606 (noting that "if a teacher had been known to be a 'serial harasser,' a school district might be found to have actual knowledge of that teacher's misconduct.").

In *Smith v. Metropolitan School District Perry Township,* 128 F.3d 1014 (7th Cir. 1997), the Seventh Circuit addressed the issue of actual knowledge, coming down on the same side of the issue as

the Supreme Court's subsequent decision in *Gebser.*  There, a teacher began a sexual relationship with a student during her senior year of high school.  The student, Smith, later filed action against the teacher, school district, school board, and school officials, alleging sex discrimination in violation of Title IX, among other claims.  "Smith told no one about the sexual relationship with [the teacher] Rager until it was over and no one ever saw them having sex together.  During the school year, Rager and Smith concealed the relationship by engaging in sex quietly in locations where they would not be observed."  *Id*. at 1017.  The dissenting opinion of Judge Rovner elaborated on the facts of the case:

> No one at Southport High School ever saw Rager and Heather having sex, but the two were frequently seen together on school grounds. For example, they frequently left the school together during the lunch hour, and they once had lunch off school grounds with another teacher. On that occasion, Rager placed his arm around Heather and hugged her in a joking manner. In addition, Rager frequently walked Heather toward her next class after their time together, and he once personally explained to the teacher of that class that he had held Heather over fifteen minutes. On other occasions, Rager simply gave Heather a note for the teacher when he caused her to be late. Rager once also indicated in the presence of an assistant school principal that he wanted to be twenty years younger so that he could marry Heather. That same assistant principal later excused Heather early from the lunchroom so that she could meet Rager at his office, but not without first asking her in a joking manner what was going on down there.
>
> Finally, Rager was a constant presence at school swim meets in which Heather participated. In the presence of Heather's coaches and teammates, Rager would rub down

> Heather's shoulders. He also would work individually
> with Heather after practice on her swimming strokes.
> Some members of the swim team wondered, and discussed
> amongst themselves, why Rager and Smith spent so much
> time together.

*Id.* at 1043-44. The Seventh Circuit held that Smith did "not contend that defendants actually knew of the relationship and failed to respond. . . . Nor do the facts support any such inference." *Id.* at 1034. "[T]here is no evidence that anyone had actual knowledge of the alleged relationship between Smith and Rager. On the contrary, it appears that Rager and Smith successfully hid their conduct." *Id.* The Seventh Circuit held that the school district was entitled to summary judgment in its favor. *Id.*

In *Doe v. St. Francis School District,* the defendant school district knew about concerns from other teachers that a teacher named Kelly Sweet ("Sweet") and one of her eighth grade students "had something like an eighth grade girlfriend/boyfriend relationship, like a crush." 694 F.3d at 872 (internal quotation marks omitted). The teachers acknowledged that they had no evidence to confirm their suspicions. *Id.* The district superintendent interviewed Sweet and concluded that her denials of any impropriety were sincere. *Id.* The student's mother subsequently discovered the sexual relationship between Sweet and the student and reported it to the school, whereupon Sweet's employment was terminated. *Id.* The student and his parents filed

a lawsuit against the school district alleging violations of Title IX and a state law claim. *Id*. at 870. The district court granted summary judgment in favor of the school district. *Id.* In addressing the actual knowledge requirement of a Title IX claim, the Seventh Circuit reiterated that "the plaintiff must prove 'actual knowledge of misconduct, not just actual knowledge of the risk of misconduct.'" *Id.* at 871 (quoting *Hansen*, 551 F.3d at 605). The court noted that the superintendent "must have considered the possibility that Sweet and the [student] were romantically involved when she asked [another teacher] whether she suspected that Sweet was doing anything 'illegal,'" but the teacher said that she didn't suspect that, and Sweet denied any improprieties. *Id*. at 872. The court found that neither the superintendent nor the principal knew about the relationship until after the student's mother discovered it. *Id*. "What the principal and the superintendent knew was that Sweet's colleagues . . . suspected an improper relationship between Sweet and the [student]. *But to know that someone suspects something is not to know the something and does not mean the something is obvious.*" *Id*. (emphasis added). The Seventh Circuit affirmed summary judgment in favor of the school district. *Id*. at 873.

As in *St. Francis*, here Plaintiff and others suspected an improper relationship between Robinson and Doe. While Doe's counselors and other parents raised concerns about the close

relationship between Robinson and Doe, none of them indicated to Defendants that the relationship was sexual. Defendants knew that Robinson and Doe ate lunch together, and spent time together between class periods and outside of school. But they also knew that Robinson was Doe's teacher and mentor, and Doe was Robinson's TA for a time. Doe told Plaintiff and Smith that her relationship with Robinson was a father-daughter relationship. Moreover, Robinson and Doe hid the sexual nature of their relationship. *See Hansen*, 551 F.3d at 606 (plaintiffs presented no evidence from which a reasonable juror could infer that any school district official had actual knowledge of the teacher's misconduct where the student hid the relationship from school officials, her parents and boyfriend). Plaintiff disputes what was known and observed by students and teachers in the school hallways, specifically, "flirtatious behavior, them placing hands on each other and being 'touchy.'" (DE #69 at 9.) Doe explained that being "touchy" meant resting his or her hand on the other's shoulder. (DE #45-7 at 24.) Robinson also interacted with other students, by, for example, messing up their hair. (DE #70-12 at 6.) "[N]ot all inappropriate conduct toward a student qualifies as sexual harassment under Title IX." *Madison Metro. Sch. Dist.*, 218 F. Supp. 3d at 833 (citations omitted) (finding that a teacher giving a student shoulder rubs was not sexual harassment where plaintiff did not allege anything sexual or erotic about the conduct, the

teacher did not single out the student, and the conduct took place in public with no attempt to hide it). Robinson and Doe only hugged, kissed or engaged in sexual activity in private. They were never seen by anyone engaging in such conduct. Plaintiff is aware of no adult who had any information about the fact that Robinson and Doe were having a sexual relationship.

Plaintiff also cites *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014), in which the Seventh Circuit noted that "[s]chool administrators certainly cannot escape liability by putting their heads in the sand." *Id.* at 617. But the court also emphasized that "[t]he standard is 'actual knowledge,'" and thus, "is not satisfied by knowledge that something might be happening and could be uncovered by further investigation." *Id.* at 617-18. There, the court found that there was no evidence that any school official willfully avoided learning of serious threats to Doe's safety or ability to obtain an education. *Id.* at 617.

Here, the evidence does not suggest that Defendants willfully avoided learning of serious threats to Doe's safety. When school counselor Smith raised concerns with Beeker, he asked Smith if she thought anything was going on between Robinson and Doe. Similarly, when Plaintiff raised concerns with Beeker, he asked Coach Frauhiger if anything was going on between Robinson and Doe. Similar to *St. Francis*, neither Smith nor Frauhiger believed that anything was going on between Robinson and Doe. While Plaintiff

believes that Defendants should have done more, the "actual knowledge" standard "is not satisfied by knowledge that something might be happening and could be uncovered by further investigation." *Galster*, 768 F.3d at 617–18.

Plaintiff argues that the December 18, 2014, incident evidences Defendants' willful avoidance of a serious threat to Doe's safety. The Court disagrees. When Defendants learned that Doe had left the school with Robinson, they acted. Beeker called Doe to tell her about it, and ask her if she knew where they were going. When Plaintiff voiced her concern that Robinson and Doe going somewhere to have sex, Beeker responded that they had no evidence of this, but he did not end Defendants' investigation. Roop and Lowrey followed Doe and Robinson to Robinson's parents' home, and when Roop and Lowrey returned to school, they searched Doe's school email account. They did not find any inappropriate messages, though they noted that Robinson and Doe had emailed each other late at night.[3] After Doe and Robinson returned to school, Beeker questioned them separately. It is undisputed that Beeker believed Doe and Robinson when they lied about only stopping by Robinson's parents' house before going to McDonald's for lunch. Beeker believed them in part because Doe carried a McDonald's cup,

---

[3] Plaintiff maintains that Doe's email to Robinson referencing the song, "My Kind of Love," expressed her romantic love for Robinson, but there is no evidence that Roop or Lowrey saw this email.

something she and Robinson had planned in order to give credence to their lies. Plaintiff believed Doe's lies as well.

Plaintiff relies upon *Mary M. v. North Lawrence Community School Corp.*, 131 F.3d 1220 (7th Cir. 1997), in which a cafeteria worker had a sexual relationship with a thirteen-year old student. There, the Seventh Circuit held that the principal had actual knowledge of sexual harassment and failed to respond where the principal knew that the worker and student were planning to skip school/work the day before they actually did, and failed to act on that information. *Id*. at 1225. The Court finds *Mary M.* to be distinguishable on the facts. Here, Beeker was not aware that Robinson and Doe were planning to leave school grounds on December 18, 2014. Moreover, unlike the situation in *Mary M.,* where the expected interaction between a student and cafeteria worker would have been limited to lunch in the cafeteria, here Robinson was Doe's teacher and known mentor, and she worked as his TA. In *Mary M.,* the cafeteria worker and the student were seen dancing together. Here, the observed interactions between Robinson and Doe were consistent with a mentor relationship.

For these reasons, the Court finds that Defendants did not have actual knowledge of misconduct by Robinson that created a serious risk to Doe, and did not willfully avoid learning of a serious threat to Doe's safety.

2.    Deliberate Indifference

Even if Plaintiff had raised a genuine issue of material fact regarding whether Defendants had actual knowledge of Robinson's misconduct, the undisputed evidence demonstrates that Defendants were not deliberately indifferent to Robinson's misconduct.  "The standard of deliberate indifference sets a high bar for plaintiffs under . . . Title IX."  *Galster*, 768 F.3d at 619.  Deliberate indifference occurs when the "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 648, 119 S. Ct. 1661, 143 L.Ed. 2d 839 (1999) (addressing student-on-student harassment under Title IX).  "This is not a mere 'reasonableness' standard."  *Id*. at 649.  Deliberate indifference can be shown where school officials "made no effort whatsoever either to investigate or to put an end to the harassment."  *Id*. at 654; *see Delgado*, 367 F.3d at 671 ("Deliberate indifference means shutting one's eyes to a risk one knows about but would prefer to ignore.").  "[A]s long as the school's response is not 'clearly unreasonable,' it cannot have acted with the requisite deliberate indifference to incur Title IX liability."  *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 824 (7th Cir. 2003) (internal citation omitted).

Plaintiff argues that Defendants did nothing to investigate or put an end to Robinson's harassment of Doe.  The evidence

demonstrates otherwise. When counselor Smith raised her concerns about Robinson and Doe's relationship, Beeker asked Smith if she thought the relationship was sexual, she said no. Beeker also asked Frauhiger, who saw Robinson and Doe interact regularly, if there was anything inappropriate going on, and Frauhiger said absolutely not. On December 18, 2014, when Beeker learned that Doe had left the school with Robinson, he called Doe to tell her about it. "Courts applying the deliberate indifference standard from *Davis* have regarded the involvement of parents as evidence that a school district is responding to harassment in a reasonable manner." *Galster*, 768 F.3d at 620 (finding defendant's responses to known acts of student-on-student harassment were not deliberately indifferent where defendant engaged in a pattern of active responses include communicating with parents) (citation omitted). Roop and Lowrey followed Doe and Robinson to Robinson's parents' home, and when they returned to school, they searched Doe's school email account. After Doe and Robinson returned to school, Beeker questioned them separately about where they were and what they were doing. Beeker believed them when they lied to him, in part because Doe was carrying a McDonald's cup in order to support their lies.

Plaintiff maintains that Defendants did nothing because they failed to question, admonish or counsel Robinson or Doe about the rumors and concerns regarding their relationship, and failed to

stop Robinson and Doe from leaving school or entering the house on December 18, 2014. The Court does not suggest that reasonable persons could not differ as to how this matter should have been handled or that Defendants' response was ideal. But "this was not a case, as it was in *Davis*, of a school making 'no effort whatsoever either to investigate or to put an end to harassment.'" *Chivers v. Cent. Noble Cmty. Sch.,* 423 F. Supp. 2d 835, 850 (N.D. Ind. 2006) (quoting *Davis*, 526 U.S. at 654). Although Defendants "could have arguably done more, the Defendants' actions were not clearly unreasonable in light of the known facts." *Id.* (citation omitted).

The Court's "role is to determine whether, based upon all of the facts presented in this case, there is a genuine issue of material fact regarding whether the [Defendants'] response was clearly unreasonable." *Id.* (citing *Davis*, 526 U.S. at 648). The Seventh Circuit has admonished judges to "be sensitive to the effects on education of heavy-handed judicial intrusion into school disciplinary issues, or heavy-handed administrative intrusion required by judges interpreting Title IX and other statutes that, along with free-wheeling interpretations of the speech and religion clauses of the First Amendment, have made education one of the most heavily regulated American industries. Let us not forget that one component of academic freedom is the right of schools to a degree of autonomy in the management of their internal affairs." *St. Francis*, 694 F.3d at 873 (citations

omitted); *see Davis,* 526 U.S. at 648 (admonishing that "courts should refrain from second-guessing the disciplinary decisions made by school administrators"). Because Defendants' response was not clearly unreasonable, it did not amount to deliberate indifference. Therefore, Defendants are entitled to summary judgment on Plaintiff's Title IX claim.

C.    Negligence Claim

Having dismissed the Section 1983 and Title IX claims, the Court does not have original jurisdiction over the remaining negligence claim in the Complaint. Where a district court has "dismissed all claims over which it has original jurisdiction," the court may decline to exercise supplemental jurisdiction over remaining claims. 28 U.S.C. § 1367(c)(3). The Court finds that it would not be appropriate to exercise supplemental jurisdiction over Plaintiff's remaining claim. Therefore, it remands this case to the Tippecanoe Circuit Court. *See Whitely v. Moravec,* 635 F.3d 308, 311 (7th Cir. 2011) (recognizing that "a district judge has discretion to relinquish supplemental jurisdiction and remand once the federal claim has dropped out" of a lawsuit).

Other Motions

The Court need not rule on the parties' other motions because they raise issues that are not material to the Court's decision to dismiss Plaintiff's Section 1983 and Title IX claims. Moreover,

Indiana state courts are better suited to decide the state law issues raised in these motions. Plaintiff's motion for partial summary judgment, Defendants' motion to limit or exclude Plaintiff's expert witnesses, and Plaintiff's motion for leave to supplement are denied as moot.


CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (DE #44) is **GRANTED.** Plaintiff's motion for partial summary judgment (DE #68) is **DENIED AS MOOT.** Defendants' motion to strike evidence (DE #78) is **DENIED.** Defendants' motion to limit or exclude Plaintiff's expert witnesses (DE #80) is **DENIED AS MOOT.** Plaintiff's motion for leave to supplement (DE #92) is **DENIED AS MOOT.** Plaintiff's claims for violations of 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), are **DISMISSED.** The Clerk is directed to **REMAND** this case to Tippecanoe Circuit Court for further proceedings.


**DATED: December 14, 2017**      **/s/RUDY LOZANO, Judge**
                                  **United States District Court**